In re Tarble.

## IN RE TARBLE.

HABEAS CORPUS— JURISDICTION OF STATE AND FEDERAL COURTS. *Right of State Court to discharge prisoner held by a military officer of the United States.— Enlistment of minors — effect of oath of enlistment as to question of age.*

1. Where one is restrained of his liberty within a state, by a military or other ministerial officer of the United States, the state courts have jurisdiction to inquire, by *habeas corpus,* into the legality of his detention, and to discharge him if detained without authority of law.
2. The enlistment of a minor under eighteen years of age is not authorized by any act of congress.
3. The ordinary enlistment oath (which contains no statement as to age) is not conclusive of the fact that such recruit is over eighteen years of age, nor is the separate statement as to his age, signed by the recruit, conclusive, unless sworn to.
4. Whether, if it appeared that a court-martial had been ordered to try such alleged recruit on a charge of desertion, the state courts would discharge him from the custody of the recruiting officer while held for trial by such court-martial, it was not necessary to decide in this case.
5. (If the prisoner were claimed to be held by virtue of a judgment of a federal court, the state court would be bound to inquire whether the federal court had jurisdiction to render such judgment, since a judgment without jurdisdiction is a nullity.   PAINE, J., *arguendo.*)

DIXON, C. J., dissents, holding that the state courts have no jurisdiction in a case like this.

In re Tarble.

CERTIORARI to a Court Commissioner.

Section 2, ch. 25 of the acts of the 37th congress, second session (12 U. S. Statutes at Large, 339), enacts : "That the fifth section of the act of twenty-eighth September, 1850, providing for the discharge from the service of minors enlisted without the consent of their parents or guardians, be and the same hereby is repealed ; *provided*, that, hereafter, no person under the age of eighteen shall be mustered into the United States service ; and the oath of enlistment taken by the recruit shall be conclusive as to his age."

On the 27th of July, 1869, one Edward Tarble (under the name of Frank Brown), being under eighteen years of age, but representing himself to be twenty-one years and one month old, was enlisted into the military service of the United States, at Madison, in this state, by H. A. Stone, a first lieutenant in the United States army, stationed at that city as a recruiting officer. At the time of such enlistment, said Tarble executed the following paper, being a blank form upon the back of the oath of enlistment, and entitled, "Declaration of Recruit : " "I, Frank Brown, desiring to enlist in the army of the United States for the term of five years, do declare that I am twenty-one years and one month of age," etc., etc. [Dated, signed and witnessed.] He also, in presence of the enlisting officer, executed the following :* "STATE OF WISCONSIN, TOWN OF MADISON :   I, Frank Brown, born in Jefferson county, in the state of New York, aged twenty-one years, and by occupation a farmer, do hereby acknowledge to have voluntarily enlisted, this twenty-seventh day of July, 1869, as a soldier in the army of the United States of America, for the period of five years, unless sooner discharged by proper authority.   Do al /agree to accept such bounty, pay, rations and clothir   as are, or may be, established

* It appeared, from the evidence in the case, that the form here given had been in use in the enlistment of soldiers in the U. S. army for at least eight years.

In re Tarble.

by law. And I, Frank Brown, do solemnly swear that
I will bear true faith and allegiance to the United States
of America, and that I will serve them honestly and
faithfully against all their enemies or opposers whomso-
ever ; and that I will observe and obey the orders of the
President of the United States, and the orders of the
officers appointed over me, according to the rules and
articles of war. (Signed) FRANK BROWN. Sworn and
subscribed to at Madison, Wis., this 27th day of July,
1869, before (signed) 1st Lieut. HENRY L. STONE, U.
S. A., Recruiting Officer." Afterward said recruit
escaped, and was reported to the war department as
having deserted ; but subsequently he delivered him-
self up to the recruiting officer, who held him under
guard as a prisoner, and forwarded to the general super-
intendent of the recruiting service charges against him
(said Tarble) as a deserter. On the 10th of August,
1869, R. J. Chase, Esq., Court Commissioner of Dane
county, on the petition of *Abijah Tarble,* father of said
Edward Tarble, issued a writ of *habeas corpus* to
Lieut. Stone, requiring him to produce the body of said
Edward, with the cause of his detention ; and thereupon
said Stone, protesting against the jurisdiction of the
commissioner, produced the prisoner, and made return
to the writ in accordance with the facts above stated.
After a hearing, the commissioner made an order for the
discharge of the prisoner, on the ground that he was
under eighteen years of age, and not subject to enlist-
ment. On the application of Lieut. Stone, the proceed-
ings were then brought to this court for review, on
*certiorari.*

*P. L. & J. C. Spooner,* for the petitioner, as to the
jurisdiction of the state courts in cases like this, cited
42 Barb. 479 ; 44 id. 98 ; 7 Barr, 337 ; 16 Iowa, 595 ; 2
Abb. Nat. Dig. 609 ; *In re Gregg,* 15 Wis. 479 ; *In re
Kemp,* 16 id. 359 ; *In re Higgins,* id. 351.   2. They
argued that the oath which congress intended to make

In re Tarble.

conclusive as to the age of the recruit, is not the oath of enlistment taken in this case. Nowhere in the oath of enlistment does the recruit swear to his age. The oath of allegiance is the only one he is required to take. The blank form used expressly negatives the idea that an oath is taken as to age. In the part first of the paper the age is stated by way of recital only. It was in the power of the war department, after the passage of the act of 1862, to change the form of the oath of enlistment, so as to make it include an oath as to the age of the recruit, and thus accomplish the object of the provision in question; but this was not done. *In Re Higgins,* 358, near top.   3. If this is the oath which congress declared should be conclusive as to the age, still it is conclusive only upon the recruiting officers, and not upon the courts.   *Webb's Case,* 10 Pittsburg Legal Journal, 106, cited in Brightly's Dig. 1101, note K; 5 Phil. on Ev. 297; 16 Wis. 350.   4. If the prisoner was not subject to enlistment, he could not be a deserter. The fact that he is held under a charge of desertion will not prevent his discharge on this writ, it not appearing that he is held by the authority of any military court, or that any such court is in existence, even, to try him. On this point counsel cited 1 Winston, 451; 5 Phil. 297; 42 Barb. 481; 7 Barr, 337; and commented on *In re Anderson,* 16 Iowa, 595, as not sustained by the authorities there cited.

*G. W. Hazleton,* United States district attorney for the respondent, contended that, in a case of this kind, where it appears that the prisoner is held by an officer of the United States army, under the authority of the federal government, by virtue of the laws of the United States, the state courts have no jurisdiction to try the cause upon the merits, but should remand the prisoner. To this point he cited *In re Ferguson,* 9 Johns. 239; *In re Emanuel Roberts,* 2 Hall's Law Journal, 192; *In re Hopson,* 40 Barb. 34; *In re Spangler,* 11 Mich. 298; *In*

*re Jordan*, N. Y. Sup. Ct.     ; *State v. Zulich*, 5 Dutcher, 409 ; *Ableman v. Booth*, 21 How. 506. 2. The provision that the oath of enlistment shall be conclusive as to the age of the recruit, is equivalent to a declaration that, if a recruit has been received and has taken the required oath, all subsequent inquiry as to his age shall be precluded. *In re Higgins*, 16 Wis. 351 ; *In re Gregg*, id. 479. 3. The prisoner should not be discharged, because the return shows that he is held upon charges as a deserter, awaiting trial. *State v. Zulich*, and *In re Hopson*, above cited ; *In re Anderson*, 16 Iowa, 595.

PAINE, J. This was a writ of *habeas corpus* to procure the discharge of a minor held in the custody of the recruiting officer of the United States as an enlisted soldier. On the hearing, the court commissioner made an order for his discharge, and the record is brought here by *certiorari*.

The only question pressed upon our consideration by the district attorney of the United States was, that of the jurisdiction of the state officer. With few exceptions, jurisdiction in this class of cases has been asserted and exercised by state judicial officers, and sustained by the highest state courts from the beginning of the government down to the present day. I shall not attempt any review of the numerous authorities on the subject. They are nearly all referred to in a note in 2 Abbott's National Digest, 609.

Upon principle, it has always seemed to me that the jurisdiction was very clear, and that it resulted necessarily from the very nature and scope of the writ of *habeas corpus*, and the absence of any provision in the federal constitution in any way abridging the well-settled power of the state courts over the writ, or exempting federal officers from its operation. This great writ is the ægis of personal liberty. It was established by the founders of constitutional freedom in England, and was

ever upheld by them with a strong hand against all the encroachments of arbitrary power. None were so high as to be exempt from obedience to it, and none so low as not to be entitled to invoke its protection. And we must ever remember with sorrow, if not shame, the contrast between our own highest court and that of England, presented in the fact, that, while ours was denying to one of an oppressed race born on our soil the poor privilege of even suing for his rights in a federal court, the queen's bench sent abroad this writ into Canada to protect the liberty of one of that same race, who was a fugitive and a wanderer upon British soil !

The high, searching, and imperative character of the writ was well settled and understood at the time of the adoption of the constitution of the United States. It was fully recognized by the provision that its privilege should be suspended only when, in cases of rebellion or invasion, the public safety might require it. The full power and jurisdiction to issue it was, at that time, a part of the undoubted sovereignty of the states. And as the constitution did not, in any manner, abridge that power, nor exempt federal officers from its operation, by all the settled principles of constitutional construction the jurisdiction still remains.

Acting upon this theory, it has been asserted and exercised by most of the state tribunals, with little serious question, until the decision of the supreme court of the United States in the celebrated case of *Ableman v. Booth*, 21 How. (U. S.) 506. Although that case related to the discharge by a state court of a party in custody under the final sentence of the district court of the United States, since its decision some courts have applied its general reasoning to cases where the party was detained by the mere ministerial officers of the federal government under color of authority, as in the *Spangler* case, 11 Mich. 298. Others have asserted that there was a distinction between cases of detention

under the judgment of a judicial tribunal and those of detention by mere ministerial officers; and have refused to apply the doctrine of the *Ableman v. Booth* case to the latter class. Such was the decision of Chief Justice DILLON, of Iowa, in the *Case of Anderson*, 16 Iowa, 595. There is some plausibility in this distinction, and it has been often suggested, as will be seen by referring to the cases.

But my own opinion is, that there is no solid distinction between the two classes, and that the doctrine of *Ableman v. Booth*, if true at all, is as applicable to one as to the other. Of course, in saying this, I include in those cases of custody under judicial sentence, only those where the court pronouncing the sentence had no jurisdiction; for in no other has any right to interfere ever been asserted. And, notwithstanding the many general remarks to the contrary in the opinion of the supreme court of the United States, this court, in the Booth case, never claimed any authority whatever to "revise," annul, or set aside the judgment or proceedings of the federal court or officers. It was never guilty of the absurdity of claiming "paramount jurisdiction in the state courts over the courts of the United States." It was much easier to impute to it such a false position, and then answer that, than it would have been to have answered the reasoning upon which it really rested its decision. It proceeded upon a very familiar principle, and one uniformly acted on by all courts. That is, that whenever, in any court, in a case in which it has jurisdiction, the validity of the judgment of any other court is drawn collaterally in question, it must decide whether the court rendering it had jurisdiction. This familiar doctrine has never been more strongly asserted or acted on than by the supreme court of the United States. In *Williamson v. Berry*, 8 How. (U. S.) 540, that court said: "But it is an equally well-settled rule in jurisprudence, that the jurisdiction

of *any court* exercising authority over a subject, may be inquired into in *every other court,* when the proceedings in the former are relied upon and brought before the latter by a party claiming the benefit of such proceedings.   The rule prevails, whether the judgment or decree has been given in a court of admiralty, chancery, ecclesiastical court, or court of common law; or whether the point ruled has arisen under the laws of nations, the practice in chancery or the municipal laws of states."

The result at which the court arrived in that case, in exercising this undoubted right, was extraordinary indeed.   It treated as a nullity, for want of jurisdiction, an order of the chancellor of New York, made under a law of that state relating to a matter wholly subject to state authority, and against the decision of the highest court of New York sustaining his jurisdiction.   But it is obvious that no error in the result of the inquiry as to jurisdiction has any tendency to impeach the right to make that inquiry.   That right exists from necessity, and without its daily exercise by all courts litigation could not be decided.   It imports no assumption of authority, by the court making the decision, over the court the validity of whose judgment is passed upon. It imports no power to "revise, annul, or set aside its judgments."  The inquiry relates solely to the question of jurisdiction.   If that existed, then the judgment, no matter how otherwise erroneous, is to have its full force and effect.   The court where it is drawn collaterally in question, can go no further.   But if that did not exist, then there is nothing to "revise, annul or set aside." The judgment was then a nullity from the beginning. No doctrine in law is better settled than this.   In truth, the decisions are uniform on the subject.   In the case last cited, the opinion refers to the decisions of that court upon this point, and quotes from its opinions in *Elliott v. Peirsol,* 1 Peters, 340, as follows: "Where a court has jurisdiction, it has a right to decide every question

which occurs in the cause; and, whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding in every other court. *But if it act without authority, its judgments and orders are regarded as nullities.* They are not voidable, but simply void, and form no bar to a recovery sought, even prior to a reversal, in opposition to them. They constitute no justification, and all persons concerned in executing such judgments or sentences are considered in law as trespassers."

That court suggests, in the Booth case, that this court could no more inquire into the legality of the imprisonment of a citizen of this state within its borders, under the order of a federal court, than it could send its writ into Michigan and inquire as to the legality of the imprisonment of a person there. It may be conceded that the state and federal judicial systems are distinct and separate, and independent of each other, as those of different states. Such a concession is clearly contrary to the existence of that appellate jurisdiction over the state courts which the federal court has asserted and exercised. But the repugnance between the doctrine of the Booth case now under consideration and the existence of that appellate jurisdiction will be hereafter noticed. I allude now to that illustration of the court simply to say, that, if the validity of a judgment of a court of Michigan should be drawn in question in any court of this state, in the exercise of its ordinary jurisdiction, the court here could decide, and must necessarily decide, whether the court of Michigan had jurisdiction to render it. The fact that the two jurisdictions are utterly foreign to each other does not prevent either from deciding to that extent upon the validity of the judgments and proceedings of the other. Here, too, the federal authority is clear and emphatic. In the case of *Rose v. Himely*, 4 Cranch, 241, the court sustained the right of an American court to decide collaterally

upon the jurisdiction of a court of *Santo Domingo.* The chief justice said : "The great question to be decided is, *was this sentence pronounced by a court of competent jurisdiction?* At the threshold of this interesting inquiry, a difficulty presents itself, which is of no inconsiderable magnitude. It is this : *Can this court examine the jurisdiction of a foreign tribunal?*" The latter question he answered in the affirmative, and in discussing it he said : "A sentence professing on its face to be the sentence of a judicial tribunal, if rendered by a self-constituted body, or by a body not empowered by its government to take cognizance of the subject it had decided, *could have no legal effect whatever.* The power of the court, then, is *of necessity* examinable to a certain extent by that tribunal which is compelled to decide whether its sentence has changed the right of property. The power under which it acts must be looked into ; and its authority to decide questions which it professed to decide must be considered." And again, he says : "Upon principle it would seem that the operation of every judgment must depend upon the power of the court to render that judgment, or in other words, on its jurisdiction over the subject-matter which it has determined."

Although all this doctrine is, as before remarked, entirely familiar, I have felt justified in thus quoting it from the supreme court of the United States, in order to show that when this court, in the Booth case, assumed the power, in the exercise of its ordinary jurisdiction to issue the writ of *habeas corpus*, to ɼ ɟ collaterally upon the jurisdiction of the district cou. of the United States to pronounce the judgment unde. which Booth was imprisoned, it was not assuming any such unwarrantable or unheard of power as it has been charged with doing ; and that, on the contrary, whatever might be said as to the correctness of its decision, still, in exercising the right to decide the question, it was pro-

ceeding upon a principle universally recognized, and exercising a right that is and must of necessity be exercised by all courts. For there is no just reasoning upon which any distinction can be asserted between a *habeas corpus* and any other judicial proceeding or suit, in respect to the right of the court to decide upon the validity of the judgment of any other court that may be drawn in question.

It is true, that, as states have no extra-territorial jurisdiction, and each can, therefore, by the writ of *habeas corpus*, inquire into the legality of imprisonment only within its own limits, such a proceeding would be less likely to draw in question the validity of any foreign judgment, than would litigation concerning rights of property. But this can make no possible difference in respect to the right of the court to decide the question, if it should arise. And although such a case may be very unlikely to arise, yet if any one should assert a right to imprison any person within this state under the judgment or order of a court of Michigan, or of any other state or country, it would scarcely be claimed that the entire separation of the two sovereignties, and the absence of any power to review the judgments of such other court, would prevent this court from inquiring upon *habeas corpus* into the legality of such imprisonment.

But under our peculiar system, where the state and federal governments, with their distinct judicial systems, exercise a divided sovereignty and jurisdiction over the same territory and people, such a question may well arise, as it did in the Booth case. And for this court, in that case, in the exercise of its acknowledged jurisdiction of the writ of *habeas corpus*, where the judgment of the district court was returned as the justification for Booth's imprisonment, to pass upon the question whether that court had jurisdiction to pronounce such judgment, was no more a usurpation of authority,

than it would have been to have passed upon a judgment of a court of Michigan or any other state, if such had been set up in justification. The fact that the district court might render a valid judgment that would justify imprisonment in this state, and that no court of another state could do so, does not vary the question. That fact gives no validity to its judgment rendered without jurisdiction, and has no legitimate tendency to impeach the right of the state court to pass upon this question. And there is nothing in the relations between the federal and state governments, nothing in the conceded supremacy of the constitution and laws of the United States, nothing in the nature or character of the federal courts themselves, which can have any just effect to make their judgments an exception to that universal rule, which, as already seen, they have so emphatically asserted, or to place them on any different footing, in this respect, from that on which the judgments of all other courts must stand.

In a suit in a state court, involving a right of property, title is claimed through a sale under a judgment of a federal court. The state court, in deciding on the effect of the sale, must necessarily pass on the jurisdiction of the court by which the judgment was rendered. This court, in a civil suit, recently passed on the jurisdiction of a federal court to render a decree for the sale of a railroad on the foreclosure of a mortgage. There was no suggestion from any quarter, that, in doing so, it was exercising any unwarranted or unusual power, or assuming any authority to control, revise or annul the judgments of that court. Nor was it. As already said, it is a power constantly exercised by all courts. But it is precisely the same power that is exercised in a proceeding by *habeas corpus*, when the validity of a judgment under which the party is imprisoned is drawn in question. A judgment in a civil suit disposes of the title to property. A judgment in a criminal suit

disposes of the prisoner's right to liberty. A civil suit involving the title to that property is the appropriate proceeding in which the jurisdiction of the court to render the one judgment may be drawn in question collaterally. A proceeding by *habeas corpus* may appropriately have the same effect as to the other. But the right of the state court to decide on the validity of the judgment in the latter case is as clear as its right in the former. It rests upon the same principles, and stands or falls by the same reasoning.

This court, in the Booth case, held the fugitive slave law, under which he was convicted, unconstitutional and void, and that therefore the jurisdiction of the district court over the subject-matter of the indictment failed. Whether it was right or wrong in this conclusion, or in subsequently denying the appellate jurisdiction of the supreme court of the United States, is immaterial, so far as the question under discussion is concerned. Both of those questions are entirely distinct from that of the right of the court to pass collaterally on the jurisdiction of the federal court, in the first instance. The latter is all that is now under consideration. And in discussing that, I have the right to assume that this court may have been right in holding that the district court had no jurisdiction. The question is to be tested upon the assumption that federal courts *may* render judgments void for want of jurisdiction, and that federal officers *may* imprison persons without lawful authority. And the vital question is, whether, in such cases, the state tribunals are utterly powerless to relieve.

It is not my design to enter into any general vindication of the positions taken by this court in that case. I have considered it only so far as was material to the question now presented; and I have said what I have, concerning the nature and effect of a judgment void for want of jurisdiction, and the right of every court to treat it as a nullity, when drawn collaterally in question

for the purpose of showing that there is no substantial distinction between the case of an imprisonment under such a judgment, and one of any other illegal imprisonment under pretense of authority from the United States, in respect to the right of the state court to inquire in the first instance by *habeas corpus* into its legality.   There cannot well be any authority less than that afforded by a "nullity."   There cannot well be any pretext of authority entitled to less consideration, than that which, in the language of Chief Justice MARSHALL, "has no legal effect whatever."   If, therefore, the state court has the right in any case to go beyond the mere inquiry whether an authority is *claimed* under the United States — if it has the right to require the return to a *habeas corpus* to show a legal authority for the imprisonment, and not a mere claim of it — such right must extend to both of the classes of imprisonment that have been referred to.

Still, in the opinion of the supreme court of the United States, there was so much stress placed upon the fact that the imprisonment was under a judgment of the federal court, without seeming to take any notice of the real ground upon which this court proceeded, or of the broad distinction between the right to review or set aside a judgment, and the right to inquire collaterally into the single fact of jurisdiction, that there is room for refusing to apply its general reasoning in that case to a case like the present, where the detention is by a mere military officer, without the judgment of any court.

But upon principle there is no distinction, and the jurisdiction of the state court extends to both.   If there were no appellate jurisdiction, the argument of convenience in favor of the position that all questions as to the legality of imprisonment, under alleged federal authority, should be decided exclusively by federal tribunals, would be very strong.   It would doubtless then have been held, that the judicial power of the United States over all cases "arising under the constitution and

In re Tarble.

laws" was exclusive.    But that appellate jurisdiction over the state courts exists.    It was provided for by an act of congress at the very outset of the government. It has been steadily asserted and exercised by the federal court ; and, though denied in a few instances by the state courts, may now be said to be universally acquiesced in.    This being so, the argument of convenience against the right of the state court to decide, in the first instance, any question under the laws of the United States, arising incidentally in a proceeding by *habeas corpus*, as well as in any other judicial proceeding, loses all its force.    And the denial of that right is utterly repugnant to the entire theory upon which this appellate jurisdiction is sustained.

That theory is, that the grant to the judicial power of the United States of cognizance of all cases at law or equity, arising under the constitution and laws of the United States, was *not* exclusive, and that neither this, nor any other, provision of the constitution deprived the state courts of the power to decide all such questions, whenever they should incidentally arise in the exercise of any jurisdiction which they then possessed. It will even be found, by referring to the proceedings of the conventions which framed and ratified the constitution, that the idea was very prevalent among its friends, that congress would leave the state courts to exercise all the subordinate federal jurisdiction, and not establish any inferior tribunals whatever.    In the convention which framed it, after a resolution had been first adopted in such form as to make the establishment of inferior tribunals imperative upon congress, it was deliberately stricken out, for the avowed purpose of allowing the state tribunals to decide all such questions in the first instance.    And the friends of the establishment of inferior tribunals afterward procured the adoption of the clause, "that the national legislature be empowered to institute inferior tribunals," observing that there was a

distinction between establishing such tribunals absolutely, and giving a discretion to the legislature to establish or not establish them. Madison Papers, 798, 799. And though the language of the provision, as finally adopted, was somewhat different, it was evidently supposed that it vested in congress merely that discretionary power, and still left it at liberty, if it saw fit, to leave the state tribunals to exercise, in the first instance, jurisdiction in all the cases which might otherwise be committed to the inferior federal courts. I know the supreme court has held that congress could vest no part of the judicial power of the United States in state courts. But such was clearly not the idea of the framers of the constitution, as seen by the proceeding already referred to, and by the fact that in the state conventions its friends defended it upon the assumption that it gave congress only such discretionary power, and that congress would, in all probability, in the exercise of that discretion, leave the subordinate jurisdiction wholly to the state courts. And where it was assumed that congress might establish inferior tribunals, the friends of the instrument nowhere claimed that their jurisdiction would be exclusive, but admitted that it would be concurrent only with that of the state courts, so far as any questions under the constitution and laws of the United States might be raised before the latter, in the exercise of any jurisdiction they then possessed. Chief Justice MARSHALL, who was a member of the Virginia convention, said : "The state courts will not lose the jurisdiction of the causes they now decide. They have a concurrence of jurisdiction with the federal courts in those cases in which the latter have cognizance." But it is idle to multiply evidences that such was the view then held. The existence of this concurrent jurisdiction is plainly contemplated by the constitution itself, fully recognized by congress in the judiciary act, providing for an appeal from the state courts, and

admitted by the supreme court of the United States as the basis of its reasoning in support of such appellate power. The constitution carefully provided that the judges of the state courts should be bound by the constitution and laws of the United States. Why was this, if they were never to decide at all upon questions arising under them?

The judiciary act provided, whenever the highest state court decided against "the validity of any treaty or statute of, or any authority exercised under, the United States," for a review of such decision by the supreme court of the United States, upon writ of error; thus expressly assuming that the state courts may decide, in the first instance, upon the validity of any statute or treaty of, or authority claimed under, the United States.

In *Martin v. Hunter's Lessee*, 1 Wheat. 342, the supreme court, in sustaining this appellate jurisdiction, say: "It must, therefore, be conceded that the constitution not only contemplated, but meant to provide for, cases within the scope of the judicial power of the United States, which might yet depend before state tribunals. *It was foreseen that, in the exercise of their ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the constitution, the laws, and treaties of the United States.* Yet to all these cases, the judicial power, by the very terms of the constitution, is to extend. It cannot extend by original jurisdiction, if that was already rightfully and exclusively attached in the state courts, which (as has been already shown) may occur; it must, therefore, extend by appellate jurisdiction, or not at all."

It appearing, then, that the framers of the constitution, the conventions that ratified it, the congress and the supreme court of the United States, have all united in asserting the existence of this concurrent jurisdiction — it having been exercised by the state courts, as well in *habeas corpus* as in other judicial proceedings, from the

formation of the government down to the decision of the
Booth case, how could it be said that this court, when, in
that case, it exercised the power of deciding on the valid-
ity of an act of congress, was taking any unusual step,
or guilty of any extraordinary usurpation? Certainly,
there was no just foundation for such a charge.

That which was really unusual and extraordinary
was, not that it assumed the power to decide upon the
question, but that, in exercising that power, it decided
against the validity of a law passed to sustain the insti-
tution of slavery. The public and judicial mind of the
country was then in such a peculiar state upon that
question, that it was doubtless this fact, together with
the subsequent denial by this court of the appellate
jurisdiction, which was, in truth, contrary to the entire
current of authority, that so shocked the nerves of the
venerable members of the supreme court, that they
failed to perceive distinctly the real theory upon which
this court had assumed the right to pass collaterally
upon the validity of a judgment even of a federal court.
Their opinion is certainly liable to the criticism, that,
almost throughout, it confounds the distinction between
an actual federal authority and a mere claim of it, and
the distinction between the right of a court to pass col-
laterally on the question of jurisdiction in the proceed-
ings of any other court, and its right to review and set
aside such proceedings where jurisdiction was conceded.
It assumed that this court claimed the latter power, and
the power to discharge any prisoner held under an actual
federal authority. And it gravely quoted our statute,
expressly requiring our courts to remand the petitioner
for a *habeas corpus*, whenever it appeared that he was
held by process from a federal court in a case in which
such court "had exclusive jurisdiction," as being repug-
nant to the theory on which this court had professed to
proceed.

This mode of treating the subject certainly justified

the remark of Attorney General STANBERRY, in his official opinion in 1867, in answer to an inquiry from the secretary of the navy, when, speaking of this decision, he said : "*The language used in this opinion is not quite so specific as might have been expected.*"   And it is worthy of remark, that the learned attorney general not only fully sustained the jurisdiction of state tribunals in cases where the detention is by a mere ministerial officer without judicial process, but that he seems to confine the application of that decision to cases where the imprisonment is not only under process, but under valid ·process.   He says : " Nor can I understand the language of the court in *Ableman v. Booth*, in reference to the exclusive jurisdiction of the United States, as applicable to any other jurisdiction, over persons restrained of their liberty, than that which depends upon *jurisdiction* acquired under process of the courts of the United States."   It has never been claimed by. any one, that the state courts had any right to discharge a person legally held in custody under the authority of the United States, either with or without process.   But even that admission does not impeach their jurisdiction to inquire, by *habeas corpus*, whether he is so held.   It only shows, that, when such fact appears, it is their duty to remand the prisoner.   True, if the jurisdiction exists, they might decide erroneously as to the legality of the custody.   What of that ?   The only result would be, ·that the very event contemplated and provided for by the judiciary act would have taken place.   They would have decided erroneously " against the validity of an authority exercised under the United States."   That this might happen, the supreme court tells us, was foreseen.   Even that part of its opinion in the Booth case which reasons in favor of its appellate jurisdiction, fully shows this, and cannot be reconciled with its intimations that the state court had no right to decide upon the question at all.   Speaking of the supremacy of the con

stitution, and the laws passed in pursuance of it, the court says: "The sovereignty to be created was to be limited in its power of legislation, and if it passed a law not authorized by its enumerated powers, it was not to be regarded as the supreme law of the land, *nor were the state judges bound to carry it into execution. And as the courts of a state and the courts of the United States might, and indeed certainly would, often differ as to the extent of the powers conferred on the general government,* it was manifest that serious controversies would arise between the authorities of the United States and of the states, which must be settled by force of arms, unless some tribunal was created to decide between them finally and without appeal."

How could these controversies arise — how could the state and federal courts differ upon these questions — if the state courts were never to decide them at all? And there is no reasoning upon which their jurisdiction in *habeas corpus* proceedings can be distinguished, in this respect, from any other part of their jurisdiction. If it be said that the power might embarrass the military operations of the government, it may be answered, in the first place, that the exigencies of military necessity may justify an officer in temporarily disregarding a writ of *habeas corpus*, whether issued by a state or federal court, as was fully recognized by all the judges of this court in the Kemp case, 16 Wis. 359.

In the next place it may be answered, that, with the power to correct their errors by appeal, there can be no more serious objection to the existence of this jurisdiction in the state courts than in the inferior federal courts. The appellate jurisdiction makes them, to that extent, parts of one judicial system. And the facilities for the protection of liberty cannot be too great. It may be further answered, that the jurisdiction has been exercised by the state courts from the beginning of the government, without any serious detriment to the federal

authority. And lastly, it may be answered, that even if any inconveniences could be shown to result from it, courts are not authorized, upon such grounds, to assume the functions of constitution makers, and import into the constitution new prohibitions upon the states. A prohibition upon this jurisdiction cannot be sustained upon any such principle as that upon which the means by which the federal government is carried on are held exempt from the operation of the taxing power of the states. There the taxing power, if applicable at all, was applicable to that which was the rightful means of executing the federal powers. It was held inapplicable, upon the ground, that, from its nature, it was unlimited and uncontrollable, and, therefore, if applicable, might be carried to the extent of entire destruction of the means of carrying on the government. But here the question is not one of disregarding or burdening any rightful authority of the United States. It is a question merely of deciding, in the first instance, in the exercise of the ordinary jurisdiction of the state tribunals to protect the liberty of the citizen, whether any person, claiming to hold him under federal authority, has shown a valid authority. And this, instead of being a discretionary, uncontrollable power, like the taxing power, is a judicial power, vested in officers sworn to support the constitution of the United States, and whose decision may be reviewed by the federal court. This so clearly distinguishes the two questions, that there cannot be held to be any just analogy between them.

There is nothing in the exercise of this jurisdiction by the state courts that at all impeaches the supremacy of the constitution and laws of the United States, or derogates from the authority or dignity of federal officers. On the contrary, where two governments exercise a divided sovereignty over the same territory, there is a necessity, arising from the nature of the case, that the officers of either must, when called upon by a tribunal

In re Tarble.

that has the right to inquire into the legality of imprisonment within that territory, show their authority.   This necessity is expressly recognized by the supreme court of the United States in the Booth case.  On page 523, they say : "The court or judge has a right to inquire, in this mode of proceeding, for what cause *and by what authority* the prisoner is confined within the territorial limits of the state sovereignty."    And again : "This right to inquire by process of *habeas corpus*, and the duty of the officer to make a return, grows necessarily out of the complex character of our government, and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each, within its sphere of action prescribed by the constitution of the United States, independent of the other.   But after the return is made, and the state judge or court judicially apprised that the party is in custody *under the authority of the United States*, they can proceed no further."

The fair interpretation of this language would require a *legal* authority to be shown.   For unless there is a legal authority, there is none at all.   There is surely a distinction between an "authority under the United States," and a mere claim of such authority.   And if the court, having this distinction in view, meant that the officer must obey the writ, and show a legal authority for the detention, then there is no ground for controversy.   It is true, they afterward said, that if the party was wrongfully imprisoned, the federal tribunals alone could afford him redress.   But even that remark could have full effect by confining its application to a case of imprisonment under a judgment of a court having jurisdiction, as the court held that to be.   In such a case, although the imprisonment might · be wrongful, on account of errors in the judgment, yet the state courts, having no power of review, could afford no relief.

But if the court meant to say that a mere claim of authority under the United States was to have all the effect of an actual authority — if it meant to say that a marshal, having the custody of a prisoner under a judgment void for want of jurisdiction (which that court itself has told us was a "nullity," and all who were engaged in executing it "trespassers"), might still properly resist the state authorities by force of arms to maintain such custody — the attorney general of the United States did well not to extend that doctrine beyond the very facts to which the court applied it. That would seem to be to lose sight of the very remedy which that court tells us the constitution provided for differences of opinion between the state and federal courts, and to fall back upon the mode of settling such differences which they say the constitution designed to guard against.

To substitute for the inquiry, upon *habeas corpus,* whether there is a lawful authority for the imprisonment, the one whether there is a mere claim to it — whether the party holding the prisoner *thinks* he has a right — is incommensurate with the high character and function of the writ itself, and with a due respect to the sovereign power of the state to relieve against any imprisonment of its citizens within its borders which is without authority of law. And we have the concurrent testimony of those who framed and those who adopted it, of congress, of the state courts, and of the supreme court of the United States, prior, at least, to the Booth case, that the constitution contemplated that the state courts should exercise this power, and that any possible evils that might be apprehended from it were guarded against, not by withdrawing the power, but by providing for a review of their judgments by the federal court.

It appeared, from the evidence in this case, that the minor was under eighteen years of age. His enlistment was, therefore, unauthorized by any act of congress. It was suggested that the law makes the oath of the recruit

conclusive as to his age. But it appears that the only oath taken by this recruit was the ordinary enlistment oath, which contains no statement as to age. We do not understand that the law intended to make this oath conclusive as to a matter not mentioned in it. But it is also usual, as was done in this case, for the recruit to sign a separate statement, which does show his age. And the law must have intended that he should be concluded, if at all, only by swearing to that. It appears that charges for desertion had been forwarded by the recruiting officer, but it does not appear that any court-martial had been ordered, so that no question arises in respect to taking a prisoner from the custody of such a court. I think the state officer had jurisdiction, and that his order should be affirmed.

COLE, J., concurs in the above opinion.

DIXON, C. J., dissents, holding that jurisdiction of the writ of *habeas corpus*, in cases of this nature, is vested exclusively in the courts of the United States, and that the state courts cannot entertain the same.

*By the Court.*— Order affirmed.